## Sajer v. Pitzer

*John B. Pearson* and *Donald G. Oyler*, for plaintiffs.
*Donald M. Swope*, for defendant.

SHEELY, P. J., October 29, 1964.—This is a motion by plaintiff to take off a compulsory nonsuit entered at the conclusion of plaintiff's case in a trial before the court without a jury. The facts are as follows:

In February 1959, Charles W. Pitzer purchased 100 shares of class A voting stock of Waugaman, Pitzer and Messner, Inc., at the par value of $1,000. At the same time he purchased 1000 shares of class B nonvoting stock, the par value of which was $1 per share, at a price of $10,000. Shortly thereafter he became a director and treasurer of the corporation. On October 24, 1959, he transferred all of his stock to the corporation and received therefor the sum of $11,000. Some time thereafter the corporation was adjudicated a bankrupt by the United States District Court for the Middle District of Pennsylvania and Gerald T. Sajer was appointed trustee in bankruptcy.

Plaintiff contends that the repurchase of this stock by the corporation was an illegal distribution of its assets and elected to rescind the transaction and to recover the purchase price from the defendant. Defendant's answer to the complaint admitted the pertinent facts but denied that the sale was illegal and further alleged as new matter that the corporation had subsequently sold the same stock to a third person without loss. Plaintiff's reply denied that the stock sold to the third person was the same stock purchased from the defendant and further denied that the third party gave full consideration for the stock.

Section 707 of the Business Corporation Law of 1933, 15 PS §2852-707, provides that the directors of a business corporation shall not declare or pay dividends, or authorize or ratify the withdrawal or distribution of any part of its assets to shareholders by the purchase of its shares or otherwise, except as authorized by that act, and that if any dividend shall be paid, or if any withdrawal or distribution of the corporate assets shall be made, except as provided by the act, the directors shall be jointly and severally liable to the corporation in an amount equal to the amount of the unlawful dividend or the unlawful withdrawal or distribution of assets. This section is the basis of plaintiff's claim against defendant, he having been a director at the time of the purchase of his stock by the corporation.

Section 701-B of the Business Corporation Law of May 5, 1933, P. L. 364, 15 PS §2852-701, provides that purchases by a business corporation of its own shares shall not be made except (1) to the extent of its unrestricted and unreserved earned surplus, or (2) if it has no such earned surplus, to the extent of its unrestricted capital surplus, but only pursuant to the prior affirmative vote of at least a majority of its outstanding shares, or (3) if it has no such earned

surplus, to the extent of the aggregate of its unrestricted capital surplus, and, if it has no such capital surplus, to the extent of its unrestricted stated capital but only if such purchase shall be made for the purpose of eliminating fractional shares, and other purposes, none of which are applicable here.

Subsection (2) does not apply to this case since admittedly there was no vote of the stockholders, and subsection (3) does not apply since the purchase of defendant's stock was not for any of the stated purposes. Therefore the right of the corporation to purchase defendant's stock was limited to the extent of its unrestricted and unreserved earned surplus. The question then is whether the corporation on October 24, 1959, did have an unrestricted and unreserved earned surplus of at least $11,000.

The testimony of plaintiff, consisting of admissions in the pleadings and corporate records, established that at a regular weekly meeting of the directors on October 24, 1959, defendant offered to sell all of his stock to the corporation, and by resolution of the board of directors, then adopted, the corporation agreed to buy the stock at the price of $11,000. The transaction was completed that day and defendant resigned as treasurer and director.

The financial statements of the corporation for the year prior to September 30, 1957, showed a surplus deficit of $10,795.08 with capital stock of $5400, or a net worth of minus $5,395.08.

During the year from October 1, 1957, to September 30, 1958, there was an operating loss of $10,605.14, increasing the surplus deficit to $21,400.22. The capital stock had been increased to $10,400, less treasury stock of $850. The net worth of the corporation at that time would have been minus $11,850.22, except for the inclusion in the balance sheet, for the first time, of an item listed as "Other Assets—Good Will" of

$100,000. Including this as an "Appraisal Surplus" created a net worth or stockholders equity of $88,149.-78. The good will item or "Appraisal Surplus" was stated to represent net commissions of $99,708 earned in the second fiscal year.

During the year October 1, 1958, to September 30, 1959, there was a net operating loss of $78,649.91. Net contributed capital had increased to $81,150 less premium paid on stock of $2450, or $78,700. Giving effect to the surplus deficit of $21,400.22 as of October 1, 1958, and the operating deficit for the current year of $78,649.91, or a total of $100,050.13, would have given the company a net worth of minus $21,350.13, except for an increase in the "Appraised Value of Renewals" to $142,290. Including that figure as an asset gave the company a net worth or "Total Stockholders Equity" of $120,939.87.

It is also noted that in the financial statement of September 30, 1959, there was a bank overdraft of $18,868.15 and that the total liabilities, exclusive of capital, exceeded the total assets by $28,875.13, and the current liabilities exceeded the current assets by $36,322.80 [$263,388.39 minus $227,065.59].

The real question in the case, then, is the status of the item in the corporation's balance sheet termed "Appraised Value of Renewals." Without this item there was no surplus of any kind and the total net worth of the corporation was in the minus column. On its face it is apparent that this item is either an appraisal of anticipated income, which would not become an asset until realized, or that it was an attempt to appraise the value of the company as a going concern, it being generally accepted that a going insurance business is worth the total of one year's renewals for sale purposes. But neither theory would constitute the item as "earned surplus." Under section 2 of the Business Corporation Law, 15 PS §2852-2, "sur-

plus" means the excess of net assets of a corporation over its stated capital. "Earned Surplus" means the entire surplus of a corporation other than its capital surplus. "Net Assets" means the amount by which the total assets of a corporation exceeds the total liabilities of the corporation excluding stated capital and surplus. "Assets" includes all properties and rights of every kind of a corporation. The appraised value of renewals would constitute neither property nor a right and therefore could not be considered as an asset for the purpose of determining surplus or earned surplus.

In Berks Broadcasting Company v. Craumer, 356 Pa. 620, (1947), the court considered section 702 of the Business Corporation Law, May 5, 1933, P. L. 364, as amended, which provides, inter alia, that "dividends may be declared and paid in cash or property only out of unreserved and unrestricted earned surplus of the corporation," practically the same language as contained in section 701-B. The Supreme Court said, "The determination of this litigation is the provision of the Business Corporation Law . . . that a corporation, in computing a surplus from which cash dividends may lawfully be paid, must not include as an asset any unrealized appreciation in the value of its fixed assets. . . . (Page 623) One of the basic principles of corporation law is that the capital of a corporation must not be impaired in any manner, except, of course, as such an impairment may involuntarily occur through losses resulting from the operation of the company's business. It is illegal to declare and pay dividends from other than a surplus consisting of an excess in the value of the assets over the aggregate of the liabilities and the issued capital stock. . . . The real problem that arises in the implementation of this legal principle is in regard to the computation of the surplus from which dividends

may properly be declared and paid, and, in that connection, one of the rules which has been generally recognized and adopted is that such a surplus must be a bona fide and not an artificial or fictitious one; it must be founded upon *actual* earnings or profits and not be dependent for its existence upon a theoretical estimate of an appreciation in the value of the company's assets. The reason why a purely conjectural increase in valuations cannot be considered for the purpose of dividends is because such reappraisals, however apparently justified and accurate for the time being, are subject to market fluctuations, are merely anticipatory of future profit, and may never be actually *realized* as an asset of the company."

The same rule is clearly stated in Mindenburg v. Carmel Film Productions, 132 Cal. App. 2d 598, 282 P. 2d 1024 (1955):

"The law is settled to the effect that paper profits, or anticipated earnings, or accrued items of debit or credit are not to be taken into consideration in computing earned surplus, either for purpose of dividends or as a basis for corporate purchase of its own shares of stock."

The authority of these cases governs the present case. The "surplus" from which payment was made for the defendant's shares was not founded upon actual earnings or profits of the corporation but was dependent entirely upon a theoretical estimate of an appreciation in value of the company's assets. The appraised value of renewals was merely anticipatory of future profit or a possible sale of the business as a going concern and was not, in fact, actually realized as an asset of the corporation. When the corporation was declared bankrupt this so-called asset vanished. The effect of the withdrawal of the funds from the corporation to pay for the defendant's stock was to

increase the actual surplus deficit of the corporation and to decrease its assets.

Plaintiff also offered in evidence the corporation tax return for the fiscal year 1959 in which the officers of the corporation placed an actual value of $1 on the renewal appraisal carried on the balance sheet at $142,-290. These returns are admissible to show the corporation's own estimate of that value: Graham Farm Land Company v. Commonwealth, 363 Pa. 571 (1950). As stated in that case, page 574: "To exclude the return is to recognize that a taxpayer can place one value on his property for tax purposes and another for the purpose of carrying on proceedings in eminent domain cases. Such a result would defeat the legislative intent as expressed in our tax statutes requiring returns to be made on actual value. There can be only one 'actual value.'"

It therefore follows that plaintiff established a prima facie case and that the compulsory nonsuit entered at the time of trial must be taken off and a new trial granted to the plaintiff.

And now, October 29, 1964, the compulsory nonsuit entered in this case is taken off and a new trial granted to plaintiff. An exception to this order is noted on behalf of defendant.